**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Appeal of Pilgrim Partnership, LLC}     Docket No. 49-3-03 Vtec
                        }
                        }
                        }
                        }

Decision and Order

Appellant Pilgrim Partnership, LLC, appealed from a decision of the Development Review Board (DRB) of the Town of Moretown denying conditional use approval for its proposed project. Appellant is represented by David R. Bookchin, Esq.; the Town of Moretown is represented by Paul S. Gillies, Esq., and is not taking an active role in these proceedings; Interested Person Joseph Bahr is represented by Charles F. Storrow, Esq.

In preliminary proceedings, the Court determined that all the components of Appellant= s proposal may be considered for approval as conditional uses under the Moretown Zoning Regulations. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit with the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellant= s property is a 7.25-acre parcel of land with frontage on Route 2, Route 100, and Cobb Hill Road, in the Commercial zoning district of the Town of Moretown, near the Waterbury town line. The property is served by the municipal water supply system. While people generally consider Route 100 as running in a north-south direction, and Route 2 as running in an east-west direction, in this location the north-south line runs diagonally across the property, with the northerly direction pointing approximately to the corner created by the intersection of Route 100 and Route 2. Accordingly, to avoid the kind of confusion that occurred during the trial, we will discuss the plans as much as possible without reference to the cardinal directions, but will instead refer to the Route 2, Route 100, or Cobb Hill Road sides of the property, and will refer at times to the southeasterly side adjoining the Stedley Partnership property as > behind= the proposed building.

The character of the area is that of mixed commercial, light industrial, and residential uses. Most of the residential uses are located on Cobb Hill Road and on Routes 2 and 100 away from the immediate area of the intersection, although there are also residences along Route 2 nearby. An elderly housing development is located between Cobb Hill Road and Route 2 a few parcels away from the proposed project. As well as offices, a skate park, a maintenance company, a restaurant, a coffee company and a horse tack business in the immediate neighborhood along Route 2, there is a saw sharpening company, an automobile sales and service business, an auto body repair and customization business, and a mini-storage facility. The restaurant opens for breakfast at 5:30; the auto body shop sends a wrecker truck out at night as needed to respond to calls.

Appellant proposes to create three areas under condominium ownership, and to develop condominium areas A and B, consisting of approximately four acres, to be used by S.T. Paving[1], Inc., itself and doing business as Vermont Tennis Courts. Area C is proposed to be graded and landscaped, and is proposed to contain the septic field for the proposed building, and a gravel pedestrian path, but is not otherwise proposed to be developed at this time. Area B is proposed to

be landscaped along Cobb Hill Road and where it adjoins Area A, but is not otherwise proposed for any development. A stormwater management system has been designed for the property as a whole that would be adequate to serve development on all three condominium areas. It is more than adequate to control stormwater from the development proposed for Area A.

A steep swale exists on Area A close to Route 2. A right-of-way to serve the Stedley Partnership property extends along the side of the swale away from Route 2, and uphill, to cross the property boundary near the proposed building. Because of these physical features, development on Area A would not have been possible any closer to Route 2 than it is proposed. A retaining wall is to be built to support the slope of the right-of-way. The central portion of Area A is relatively flat, sloping steeply upwards near the Stedley Partnership boundary on the Route 2 side of the proposed building. The adjacent portion of Area B is also relatively flat, sloping steeply upwards to a small wooded plateau adjacent to Cobb Hill Road across from Mr. Bahr= s property.

Appellant proposes to construct a 7,200-square-foot building (60' x 120') on the relatively flat central portion of Area A, with the rear wall located thirty feet from the Stedley Partnership property boundary. The building is intended to be used for a business office, indoor storage of inventory and materials used in the business, and indoor maintenance of registered and unregistered vehicles and construction equipment used in the business. The sixty-foot-wide end of the building facing Route 2 contains one very large and two standard-sized garage-type overhead doors, capable of accommodating all the types of equipment and truck proposed to be maintained within the building. The end of the building facing Cobb Hill Road only contains one overhead garage door, and is sized and planned to be used for the smaller pickup-sized vehicles only. Underground storage tanks for gasoline and diesel fuel will be installed as shown on the plans on the Route 2 side of the building, in compliance with the state underground storage tank regulations.

The building is designed with a number of residential-type design features to help it blend with the residential as well as the commercial buildings in the area. It is designed with a peak (gable-end) roof rather than a flat roof, and a brick foundation course, and it will have siding with the appearance of clapboard on its long front side. It will have a peak roof entrance portico perpendicular to the long front of the building, and is designed with residential-scale windows along the front side and Cobb Hill Road end of the building. It is located within the site very close to the Stedley Partnership property boundary, and tucked within the rise of land on that side. It is oriented so that the shorter ends of the building face Cobb Hill Road and Route 2. The front of the building faces an interior roadway that has the potential for presenting the appearance of a pedestrian scale streetscape, depending upon what uses if any are developed within Area C of the condominium property.

Appellant proposes to construct outdoor areas for employee parking, parking of trucks and equipment, and limited materials storage. The only outdoor storage of materials now proposed is in a fenced area behind of the building. The only materials now proposed to be stored are A Har-Tru,@ (a tennis court surfacing material) stored in bags on pallets, and tennis court fencing stored in rolls as needed for particular jobs. Appellant no longer proposes to store aggregate or recyclable asphalt pieces on the property in the bins formerly proposed closest to Cobb Hill Road, and no longer proposes to spread soft asphalt at the site for hardening into pieces capable of being handled for recycling, and no longer proposes to use a loader to move aggregate or hardened asphalt materials on the property or in particular on the Cobb Hill Road side of the building.

Appellant proposes to create an interior roadway on the site, perpendicular to and leading onto the site from Route 2, located on both Area A and Area C. This is the sole proposed access to the property. An access formerly proposed to lead to materials storage bins off Cobb Hill Road is no longer proposed, as those bins are no longer proposed. The interior roadway is proposed to remain private. It is proposed to be landscaped with > street trees= on both sides. As it enters the

property and for a length of approximately 160 feet, the interior roadway is forty feet in width, with one entrance lane into the property and two exit lanes onto Route 2: a right-turn lane and a left-turn lane. There are adequate sight distances along Route 2 in both directions from the access driveway.

A driveway leads onto Area A from that interior roadway to a large paved parking area, without pavement markings, on the Route 2 side of the proposed building. The interior roadway continues for approximately an additional 160 feet at a reduced width of 24 feet, and leads in a loop near the boundary of Area A with Area B, through a fifty-five-foot-wide (by scale) paved area in front of the proposed building, back towards the large unmarked parking area. No parking of equipment or large trucks is proposed to take place in the paved area in front of the building. No parking of passenger vehicles is proposed to take place in the paved area in front of the building.

Appellant proposes to light the site with two pole-mounted downcast metal halide lights on a timer, plus downcast metal halide lights mounted on the building corners. Appellant did not state whether the building-mounted lights were proposed to be on all night, or also to be on timers, or to be equipped with motion detectors.

Appellant proposes to provide a gravel pedestrian walkway from the landscaped island across from the front of the building, leading diagonally across Area C to the Route 2/Route 100 intersection. Appellant proposes to locate that gravel walkway sidewalk so that it can be integrated with any future sidewalks along Route 100 and Route 2 in conjunction with any Town plan for the construction of pedestrian sidewalks in the area, but does not propose to provide any sidewalks on its property along Route 2 or Route 100 at this time.

Noise is caused by the operation of the various vehicles on the site, including the noise of their engines and the noise of their back-up alarms. Appellant tested a so-called worst case scenario of a truck operating its back-up alarm and a truck idling in the parking area on the Route 2 side of the building, a truck accelerating <u>and</u> operating its back-up alarm at the building entrance on the Route 2 end of the building, a pickup truck at the building entrance on the Cobb Hill Road end of the building, and a truck accelerating around the loop driveway in front of the building. Without any mitigating measures, the operation of these vehicles nevertheless resulted in the property= s meeting the limit of no more than 70dBA at the property lines, except at the Stedley Partnership property line between the Route 2 end of the building and Route 2. Modeling of the site with a noise mitigation wall brought the predicted values down below the limit at all property boundaries. At Mr. Bahr= s house slightly higher in elevation than Cobb Hill Road, the value was at approximately 55dBA with no mitigation measures, which level meets the general short term standard of 60 dBA to avoid disturbing sleep. (The general nighttime standard of 45dBA is not at issue as no operations are proposed on the site in the nighttime.)

However, certain types of noise, such as the back-up alarms, are more disturbing in a mixed residential and commercial neighborhood setting, than is the mere noise of traffic or truck engines warming up, due to the frequency or pitch of the sound as well as its intensity or volume. Moreover, noise that is acceptable during waking hours may be unacceptable during sleeping hours. Mr. Bahr proposes hours of operation beginning at 7 a.m. on weekdays and 8:00 a.m. on Saturdays, for this reason.

Appellant proposes to install three noise mitigation measures. The first is to install so-called > smart= backup alarms that adjust their volume to the ambient noise level, so that they operate at just above the level of the vehicle= s engine noise in a relatively quiet environment such as this, but operate at a sufficiently loud level in the much louder environment of a paving job site. The second is to put those back-up alarms on a toggle switch so that they could be turned off if the trucks had to be operated on the site outside of certain hours. The third is to monitor the site after the building and paved surfaces have been constructed, and to install a noise mitigation wall (shown in the position marked as > fence= on page 5 of Exhibit 8) at a height of six to ten feet, as

necessary, if the monitoring of actual conditions conducted by a qualified noise consultant shows it to be necessary.

Appellant= s work season runs from mid-April to mid-November. All of the tennis court and paving work performed is performed off site. In season, as many as 28 people are employed by the company, but only three or four work on site. Off season, only a mechanic and an office staff of four are employed on site, working five days a week from 8 a.m. to 4:30 p.m. The remainder either go directly to the job site or come in to the office for 15 to 30 minutes at the beginning and the end of the work day to leave their personal vehicles and pick up the vehicles, equipment and materials needed for the job. When possible, the large equipment and trucks are left at a work site or moved from one work site directly to another. However, to get to a relatively distant job site, from time to time it is necessary for Appellant to have employees at the asphalt plant by 7 a.m., which requires them to arrive at the project site and pick up equipment from the site as early as 6:30 or 6:00 a.m. Appellant= s annual operations include approximately 110 days with operating hours from 7 a.m. to 4:30 p.m., and approximately 30 days which exceed those hours (generally earlier).

Trucks do not perform a backing up maneuver in the mornings. When the vehicles and equipment return to the property at the end of the day, they are refueled and backed into their parking spaces, so that in the morning they can be started, warmed up and leave the property frontwards. From time to time when returning from a distant job site, it is necessary for Appellant to perform these maneuvers after 5:00 p.m.

The diesel equipment requires from ten to twenty minutes of warming up, depending on the ambient temperature. An engine preheater makes it easier to start this type of engine, but does not reduce the time needed to warm it up and get the oil circulating, before it is operated. Appellant proposes to run the engines for the minimum time needed in any given morning to accomplish the necessary warmup.

The vehicles and motorized equipment currently owned and used by S.T. Paving are the following: three 1999 Volvo tri-axle dump trucks; one 2000 Freight-line tractor; one lowboy trailer; one 25-ton flatbed trailer; two pavers; four rollers; two graders; one small backhoe/loader; three pickup trucks; two rack trucks; and one shoulder widener.

Appellant proposes a four-space parking area for employees, including one wheelchair-accessible space, at the Cobb Hill Road end of the building. Appellant proposes a large paved but unmarked parking area on the Route 2 side of the building, sufficient to park all the equipment, dump trucks and other vehicles when those vehicles are not out on jobs, and sufficient to park employees= passenger vehicles while those employees are out on jobs with that equipment.

The project is located close to the intersection of Route 100 with Route 2, with the access from the project on Route 2. Route 2 carries approximately 3,893 vehicles per day at this location, and 540 vehicles in the peak hour. The Vermont Agency of Transportation (VTrans) letter in evidence approving the proposed changes to the Route 2/Route 100 intersection refers to a traffic report not submitted in evidence, which analyzed a proposal of Appellant= s that was estimated to generate approximately 18 vehicle trips entering and 4 exiting in the morning peak hour, and 12 vehicle trips entering and 57 exiting in the afternoon peak hour. These estimates may correspond to a previously-proposed larger proposal, as they do not appear to correspond to the actual operation of this business as described in evidence, and do not appear to address either the smaller actual numbers of employees who are expected to pick up their vehicles and drive away from the location in the afternoon, or the fact that not all the equipment would return to the site each afternoon. (That is, even if every on-site and off-site employee drove a separate vehicle away from the site in the peak hour at the end of the work day, it would only amount to 28 trips exiting the site). Even using the peak numbers from the VTrans letter, the traffic generated by this

project would not adversely affect the traffic on any of the roads in the vicinity, given the improvements proposed to be made to the Route 2/Route 100 intersection.

At the present time the Route 2 direction is unsignalized and Route 100 has a stop sign. During certain times of the day, traffic proceeding on Route 100 towards the intersection has an excessively long wait to enter onto Route 2, especially making the left turn onto Route 2. This is a problem without the additional traffic added to the area by Appellant= s project. Because of the volume of traffic already using Route 2 compared to the traffic generated by this use, Appellant= s project will not have an undue adverse affect on the functioning of the intersection or on traffic on the roads and highways in the vicinity generally. To improve the functioning of the intersection, Appellant has proposed and the Vermont Agency of Transportation has accepted the installation of a three-way stop condition (stop signs on all three approaches to the intersection) at the intersection. This three-way stop sign will improve the functioning of the intersection for the traffic coming from Route 100, but will slow it down for traffic proceeding in either direction on Route 2. No evidence was presented that Appellant= s traffic experts had studied whether a roundabout, or even a blinking red light activated only at certain times of the day, would be a better solution for this nearby intersection (irrespective of whether traffic from Appellant= s project will affect the existing problems at that intersection, and regardless of the share Appellant might be expected to contribute to such other proposal). In any event, the VTrans approval in evidence as Exhibit 18 provides that if traffic from this project increases to the point where other modifications are necessary, the permit holder may be required to provide a further traffic study and to bear the expense of such improvements.

We first address the issue of whether the proposal requires subdivision approval as well as conditional use approval. While this question is not directly before the Court in the present case, as it was not raised in the Statement of Questions and Mr. Bahr did not file a cross-appeal, it must be addressed in considering ' 5.2(C)(4) of the conditional use general standards: that the proposal complies with > all bylaws in effect.=

Appellant argues that its proposed condominium arrangement for the land does not require subdivision approval because it does not create two or more A lots, blocks or parcels.@ Mr. Bahr argues that under the condominium agreement, portions of the property will be devoted exclusively to the use and occupancy of S.T. Paving and therefore creates the functional equivalent of separate lots or parcels. The Town has not taken a position on whether a condominium project also requires subdivision approval under the Moretown Zoning Regulations; although we note that ' 5.2(D) of the conditional use requirements does apply specific standards similar to those otherwise considered in site plan review or subdivision review. At least for the purposes of analysis under ' 5.2(C)(4), while the proposed condominium agreement creates areas treated differently within the parcel, it does not create any A lots, blocks or parcels@ that divide the leasehold or fee ownership of the property as the term > subdivision= is defined in this particular Town= s Zoning Regulations. See also, Appeal of Lowe, 164 Vt. 167 (1995).

Moreover, even if this proposal were to require subdivision approval, under ' 3.13(B) of the Subdivision Regulations, such approval would not have to be obtained prior to obtaining conditional use approval, which is all that is at issue in the present appeal. If subdivision approval were required, it would only be a prerequisite to issuance of a zoning permit, not to conditional use approval.

We then turn to determining whether, with appropriate conditions, the project meets all the general and specific standards for conditional use approval.

Section 5.2(C)(1) requires that the proposal not adversely affect the capacity of existing or planned community services or facilities. The project site is served by and has an adequate allocation of municipal water supply, and will not in any other way adversely affect the capacity of

existing or planned community services or facilities. The project= s effect upon traffic is not considered under this criterion but under ' 5.2(C)(3).

Section 5.2(C)(2) requires that the proposal not adversely affect the character of the area. The character of this area is that of mixed commercial, light industrial, and residential uses. The proposal fits into the uses in the area. It will be essentially dormant in the winter, and will not be obtrusive during its operating season, as the bulk of the outdoor activity on the site will be limited to approximately a half-hour in the morning and a half-hour in the mid- to late-afternoon. Vehicle and equipment maintenance activities will take place indoors, with the doors remaining closed except as necessary to move vehicles and equipment in and out.

Section 5.2(C)(2) requires consideration of the Town Plan= s vision for the area, as well as examining the current character of the area. The Town Plan, at pp. 68-69, recommends as a land use policy to A designate the Route 2/Route 100 intersection [as] a growth center and [to] encourage a mix of compatible commercial, residential and industrial uses, providing that such uses are designed in a manner that reflects high quality of site design characterized by the following features:@ including that buildings be located close to roads, with entrances and facades oriented toward the road, to create a defined streetscape; that buildings be two to three stories and designed to include varied roof forms and traditional building materials; and that an integrated network of sidewalks and a pedestrian scale of building development be promoted for the area.

The proposed building incorporates a peaked roof design using building materials that reflect a traditional appearance and residential scale of windows and entrance. While the building could not be located oriented towards Route 2, because of the gully and the right-of-way, it was also appropriate to orient the building so that the building itself would block the noise and movement in the large paved parking area from the more residential area of the neighborhood along Cobb Hill Road. For the same reason, it is most appropriate for the large parking area to be located on the Route 2 side of the building, and that location is therefore approved under ' 4.9(3) regarding parking.

To create at least the potential for a defined streetscape within the property, the front of the building also faces an interior roadway that has the potential for presenting the appearance of a pedestrian scale streetscape, depending on the future development of Area C along the interior roadway of the parcel. It also remains possible to develop Area C with a pedestrian streetscape along Route 2 in the future. However, any approval of the present plan must be conditioned on Appellant= s future installation of pedestrian sidewalks on its property adjacent to the Route 2 or Route 100 rights-of-way, as required by plans for the Town= s future sidewalk network.

Section 5.2(C)(3) requires that the proposal not adversely affect traffic on roads and highways in the vicinity. Even using the estimates used in the report on which VTrans based its approval of the intersection improvements, which appear to overestimate the amount of traffic that will be exiting this property in the afternoon peak hour, this proposal will not add a significant amount of traffic to Route 2 as it is already a very busy through road. Appellant= s addition of all-way stop signs to the intersection of Route 2 and Route 100 will improve the overall functioning at that intersection. Depending on the functioning of the stop signs, either the Vermont Agency of Transportation or the Moretown DRB may require Appellant to do an additional traffic study, and may require Appellant= s participation in the costs of installation of another alternative at that intersection.

Section 5.2(C)(4) requires that the proposal not adversely affect other bylaws in effect. With the conditions imposed, and the approval of parking between the building and Route 2, it does not adversely affect any other bylaws in effect.

Section 5.2(C)(5) requires that the proposal not adversely affect the utilization of renewable energy resources. It does not block the potential for solar, wind or water power on any adjacent property nor in any other way affect the use of renewable energy resources.

Section 5.2(D)(1) provides that the DRB, and hence this court, may impose specific conditions to ensure that the design and location of the building be compatible with its proposed setting and context. The residential-type design features for the building, and especially its roof style and fenestration, make it compatible both with the residential and the commercial buildings in the area. Its location and orientation within the site also make it compatible with its context, as it is much less obtrusive than if it had been placed closer to the intersection. No additional conditions are required to carry out this criterion.

Section 5.2(D)(2) provides that the DRB, and hence this court, may impose specific conditions to ensure that the project provides adequate on- and off-site vehicular and pedestrian circulation. The project provides adequate on-site and off-site vehicular circulation and adequate on-site pedestrian circulation as designed. In particular, the internal loop roadway will maximize the flexibility of maneuvering vehicles and equipment on the site to avoid conflicts and avoid the unnecessary use of back-up alarms. However, to achieve adequate pedestrian circulation along the perimeter of the site, Appellant must in the future install pedestrian sidewalks on its property along the Route 2 or Route 100 rights-of-way, as may be required by the Town= s plans for its future sidewalk network.

Section 5.2(D)(3) provides that the DRB, and hence this court, may impose specific conditions to ensure that the project provides adequate parking and service areas. As designed and with the current mix of equipment for the business, the project provides adequate parking for all the equipment and vehicles used in the business, for on-site employees= vehicles, and for off-site employees= vehicles while they are out with other equipment. Appellant specifically is not requesting approval of any parking in the wide paved area in front of the building. To keep this area functioning as designed, it is necessary to impose conditions that Appellant install signage requiring no parking in that area, and that a permit amendment will be required if Appellant wishes to convert a portion of that area to parking use.

Section 5.2(D)(4) provides that the DRB, and hence this court, may impose specific conditions to specifically approve any proposed outdoor storage. The fenced area behind the building is the only outdoor storage proposed, and it may be approved as proposed. No additional conditions are required to carry out this criterion.

Section 5.2(D)(5) provides that the DRB, and hence this court, may impose specific conditions to ensure that stormwater runoff is adequately managed. No additional conditions are required to carry out this criterion.

Section 5.2(D)(6) provides that the DRB, and hence this court, may impose specific conditions to ensure that light is the minimum required for safety and security, and that it will not adversely affect neighboring properties or the quality of the night sky. In order to ensure that the building-mounted lighting will meet this standard, it shall be controlled by timers or motion-detectors, or any combination of timers and motion detectors, to ensure that between 9:00 p.m. and 5:30 a.m. that lighting is activated only for the minimum time necessary to provide safety and security.

Section 5.2(D)(7) provides that the DRB, and hence this court, may impose specific conditions with respect to landscaping and screening. No additional conditions are required to carry out this criterion, other than that Appellant install the landscaping as required by the landscaping plan in evidence in Exhibit 6, and that the landscaping be maintained and any dead plant material be replaced in compliance with those plans.

Section 5.2(D)(8) provides that the DRB, and hence this court, may impose specific conditions to ensure that the proposed development complies with the use standards of Article III and the district standards of Article II. No additional conditions are required to carry out this criterion.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant= s application for conditional use approval as presented in the hearings before this Court in July 2003 is approved, subject to the following conditions:

1. The project shall be completed and operated in accordance with the application as presented in evidence to this Court, including the plans submitted as Exhibit 6, and including the sound mitigation fence discussed above, which may be installed at any height from 6 feet high to 10 feet high as warranted by testing by a qualified consultant on the site **after** the building and the site are otherwise constructed, including all on-site paving. All test results shall be provided to the parties to this appeal. If the test results warrant not installing the fence, and the parties to this appeal agree, they may stipulate to the Court= s entry of an amendment to this order. If they do not agree, Appellant may apply to the DRB for an amendment of the conditional use approval to delete it from the permit conditions. Appellant shall not operate, store or park any heavy equipment or large trucks, including dump trucks, closer to Cobb Hill Road than the Cobb Hill Road end of the building, except that vehicles may exit the overhead door on that end of the building from time to time, or travel on the interior loop road, as necessary to avoid backing up maneuvers outside the building.

2. Outdoor short- and long-term parking and storage of all vehicles and equipment shall take place only in the large paved but unmarked area on the Route 2 side of the building, except that up to 4 passenger vehicles may be parked in the spaces on the Cobb Hill Road end of the building. Any other outdoor parking configuration requires an amendment to this conditional use approval, including if Appellant= s business expands to require the storage on site of greater numbers of trucks and equipment than will fit in this location. This approval does not authorize the parking of any equipment or any vehicles, including passenger vehicles, in the area in front of (on the Route 100 side of) the building, and Appellant shall install signs advising employees and visitors of these parking requirements.

3. Appellant shall ensure that vehicle engines warm up by operating at idle in the morning only for the minimum time necessary to allow the vehicle to be operated properly, and in any event no longer than 20 minutes. On any equipment or vehicles equipped with back-up alarms that will be operated in reverse on the property, Appellant shall install so-called > smart alarm= back-up alarms to minimize the volume of backup alarms sounding on site during the daytime hours, and shall also install toggle switches as permitted under federal regulations to be able to shut off backup alarms if equipment must be backed up on-site prior to 7 a.m.

4. All repair or maintenance work on vehicles or equipment shall be conducted inside the building, and the doors shall be closed at all times except as necessary for vehicles or equipment to be brought into or out of the building. To the extent possible, vehicles and equipment shall enter and exit the building through the doors on the Route 2 side of the building.

5. The approved hours of operation without special restrictions are from 7:00 a.m. to 5:30 p.m. Monday through Friday and from 7:00 a.m. to 4:00 p.m. on Saturdays; however, when necessary to accommodate distant job sites, Appellant may have employees arrive at the site in time to leave with the necessary vehicles as early as 6:00 a.m., provided that the vehicles are left the night before parked so as to minimize on-site maneuvering, and provided that no backup alarms sound on site prior to 7 a.m., regardless of whether that is accomplished by carefully thought-out parking or by the use of toggle switches as allowed by federal regulations to turn off the alarms on site during this time period. Similarly, Appellant may have employees return in the late afternoon as late as 7:00 p.m., as necessary to return from a distant job, but shall turn off the backup alarms while refueling the vehicles and maneuvering them as necessary to leave the next

morning. Appellant may use the business office on Sundays; but shall not move any equipment or vehicles, other than passenger vehicles on site on Sundays.

6. The landscaping shall be planted and maintained as shown on the landscape plan that is part of Exhibit 6 in evidence in this proceeding. Plant material that does not survive shall be replaced, as soon as the season permits, with plant material of equivalent size. All undeveloped areas shall conform to the grading plan and shall be maintained to provide safety and visibility for the pedestrian walkway through Area C.

7. The pole-mounted and building-mounted lighting shall be controlled by timers or motion-detectors, or any combination of timers and motion detectors, to ensure that between 9:00 p.m. and 5:30 a.m. that lighting is activated only for the minimum time necessary to provide safety and security.

8. Appellant shall in the future install pedestrian sidewalks on its property along the Route 2 or Route 100 rights-of-way, as may be required by the Town= s plans for its future sidewalk network.

9. Appellant shall provide for the Town= s permit files a complete set of plans as presented in evidence as Exhibit 6 in this proceeding.

Dated at Barre, Vermont, this 30th day of September, 2003.



_____
Merideth Wright
Environmental Judge

---

**Footnotes**

[1.] For ease of reference we will use the term Appellant to refer to S.T.Paving as well as to Pilgrim Partnership, as the distinction is clear from the context.